### DAVIS *et al. v.* BARRETT, executor.

ATKINSON, J.   1. The court instructed the jury:  "The plaintiff contends, gentlemen, that the money loaned to Mr. Davis was part of the purchase-money that went to pay for this land at the time that the deed was made from Mr. Smith, I believe it was, to Mr. Davis. I charge you, gentlemen, that this money received from the plaintiff, or any part of it, I mean received from the Gunter estate, was used by Mr. Davis in purchasing that land, that it was his money that went in there, even though Mrs. Davis may have furnished some of the money to purchase this land, then Mrs. Davis would not have any greater interest in this land than the amount she paid bore to the proportion paid by Mr. Davis bore to the whole. In such case she

Cancellation of Instruments, 9 C. J. p. 1258, ·n. 62, 63, 64; p. 1259, n. 76.

Fraudulent Conveyances, 27 C. J. p. 792, n. 61.

Husband and Wife, 30 C. J. p. 693, n. 3; p. 724, n. 30.

New Trial, 29 Cyc. p. 788, n. 3; p. 824, n. 41.

Trial, 38 Cyc. p. 1617, n. 34.

Trusts, 39 Cyc. p. 131, n. 92.

would only be entitled to such portion as the amount she paid bore to the whole." The instruction given stated a correct principle of law applicable to one theory of the case as shown by the evidence.

2. The court did not err in charging: "I charge you, gentlemen, that a married woman may make contracts with other persons; but when a transaction between husband and wife is attacked for fraud by the creditors of either, the onus is on the husband and wife to show that the transaction was fair." This was a correct statement of the law (Civil Code, § 3011), and was applicable to the pleadings and evidence in the case.

3. Exceptions to charges as to the validity and invalidity of deeds made to hinder, delay, and defraud creditors or voluntary deeds made by a husband to his wife, on the ground that such charges were not adjusted to the theories of the case made by evidence for the defendants, were without merit, as the evidence was conflicting and did not demand a finding that when the deed was made by the owner of the land in question to Mr. Davis, the name of the husband instead of that of the wife was inserted as grantee by mistake and that a trust arose in favor of the wife. Nor did the evidence demand a finding that the husband was solvent at the time of making a gift to his wife, nor that the wife furnished the husband the money with which to pay for the property, nor that the wife did not know of the plaintiff's debt at the time of the conveyance of the husband to herself.

4. None of the exceptions to the charge as complained of in the several grounds of the motion for new trial show cause for a reversal.

5. The evidence was sufficient to authorize the verdict for the plaintiff, and the judge did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur.*

No. 5335.   FEBRUARY 16, 1927.

Equitable petition. Before Judge Hutcheson. Rockdale superior court. January 18, 1926.

W. B. Barrett, as executor of the will of Mrs. M. E. Gunter, instituted an action against W. R. Davis and his wife, Mrs. Annie A. Davis, to cancel a deed made by the former to the latter, to enjoin the latter from selling the land, and to subject the land mentioned in the deed to payment of a judgment theretofore obtained by the executor against the said W. R. Davis. The petition in part alleged substantially the following. W. R. Davis borrowed $6,000 from Mrs. M. E. Gunter, for which he executed his promissory note. He purchased from a third person the land described in the deed from himself to his wife, and used some of the money borrowed from Mrs. Gunter to finish paying for the land. After maturity of the note to Mrs. Gunter, Davis executed a deed which purported, in consideration of "love and affection . . and $5.00," to convey the land to his wife, Mrs. Annie A. Davis. The deed was duly attested and recorded. A judgment

was obtained on October 1, 1922, by plaintiff as executor of the will of Mrs. Gunter, against W. R. Davis for the amount of the note, upon which an execution was duly issued and recorded. The judgment declared a special lien upon property of W. R. Davis other than that described in the deed from Davis to his wife, and said other property was insufficient to pay the debt. Other allegations were to the effect that the land was purchased by Davis for himself, and that the deed to his wife was "without sufficient consideration in law, and . . was executed, delivered, and recorded . . for the purpose of hindering, delaying, and defrauding the creditors of W. R. Davis." An amendment to the petition alleged that W. R. Davis was insolvent at the time of executing the deed to his wife. The defendants filed an answer which, as amended, denied that any of the borrowed money was used in part payment for the land involved, or that the deed was without sufficient consideration, or that it was made to delay or defeat creditors. The answer alleged that the property conveyed by Davis to his wife was purchased for her; that the deed was intended to be in her name, but in closing the transaction when Mr. Davis went to the attorney's office the latter had prepared the deed in Mr. Davis's name, and that, Davis having stated that he wanted the deed made to his wife (the plaintiff being also present), it was stated either by him or another person that it did not matter, as Davis could make a deed to his wife. An amendment to the answer alleged that a few days before the deed to the husband, the defendants came together, and Mrs. Davis selected the place for a home, and instructed her husband to buy it for her; and that she provided the money and the place was paid for with her money.

The plaintiff and defendants introduced evidence at the trial, which, although conflicting, tended to support their respective contentions as expressed in the pleadings. The land was purchased from Fletcher Smith for $17,000 cash. The deed from Smith to Davis was dated January 2, 1920, and the deed from Davis to Mrs. Davis was dated December 14, 1921. W. R. Davis testified, concerning payment to Smith for the land: "I first gave a check for $600 . . the day I came up here and closed the trade, and the remainder, $16,400, I paid in another check . . on the 3d of January. . . I paid $17,000 for the place.

There was none of this Gunter money went into this place here of my wife's, I had plenty money of my own." He further testified: "My wife made her money by saving and accumulating around the house, saving what she made and what I give her. I paid her a salary at the store, I paid her $30 a month for 8 years, and I gave her money at different times trying to get up enough to buy her a home, and she would save what I gave her along. What she accumulated around the house and by saving, I just kept the money for her. She had this amount of money that went into this land; that was her money that I paid for this place, her home. She had this $17,000 that went into this land out here. . . She paid no taxes on that $30 a month I paid her, during those years. I used the money myself and paid the taxes." He further testified: "As I said, I run a store for 8 years, and I guess I kept an accurate account of the money I paid my good wife. I would say I did. I kept an account of it, but I don't happen to have those old books and accounts that I kept, down here in the court-house. That went along from year to year; there was no money passed. She would wait on me for the money, I would settle up with her, and she would leave it with me to keep, and I gave her money, Christmas presents [in] money, she said she would deposit it with me. I was her banker; that is it. She didn't take any of it from me. I began in the store, merchandising, in 1912, I think it was, may be 1911, from that time until . . the beginning of 1920. . . During all that time I paid her $30 a month. I don't say that in 8 years, that at $30 a month, till we moved over here, she accumulated $17,000. I didn't say anything like that, but I let it stand that she had saved up $17,000. My wife had the money that she had saved up back for 25 years. . . Anything that she could sell and accumulate around the house was hers, anything we had that we didn't use that she could sell; it didn't make any difference, meat, chicken, eggs, what we didn't use, she sold it as hers, and we started about 25 years ago, and I don't say she accumulated all that in 18 years; that started about 25 years before 1920, about 1895, around there. Anything she sold, as I have said, was hers. I gave her anything she sold about the house."

Mrs. Davis testified: "I had $17,000 to put into this place. Mr. Davis handled my money, handled it for me; he kept it for

me. . . Me and my husband have been married 33 years. I had no property of any kind when we were married. We made this money just by hard work and taking care of it. . . . I never had any separate estate. I never inherited any property. The only money that I had was such money as Mr. Davis from time to time owed me and what we made ourselves. We worked together, worked hard and saved; that is what we done. There was no specific amount turned over to me. Mr. Davis just kept my money until I got ready to invest it in the property. I would have it in my possession, and then turn it back over to him. I never carried any bank account. I never had any bank account, no book. Mr. Davis was using my money. That started about 33 years ago. I had no contract with him after we married to pay me so much for my services until I began working in the store, and I never performed any duties except household duties until I worked in the store. There was no special amount agreed on, I just had everything I could turn into money that we didn't use. We never had any agreement how much he was to pay me. I just had what I could make and what I could earn and save, and I had what I could earn around the house, and had a little spending money, pin money. . . At Christmas sometimes he would give me as much as $100. . . He didn't give me the same amount every time. That didn't commence in the early days. . . But . . it has been for several years, he would give me money once in a while too, between times. Then he paid me $30 a month to run the store for 8 years, and then give me Christmas presents, and give me what I made around the house; he has done all that, and I have saved, as I say, $17,000."

A verdict was returned for the plaintiff. The exception is to the judgment refusing the defendants' motion for a new trial.

*J. R. Irwin* and *George & John Westmoreland,* for plaintiffs in error.

*R. L. J. & S. J. Smith, J. H. McCalla,* and *Horace & Frank Holden,* contra.